**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN RE MUELLER ELECTRIC COMPANY
*Debtor*

CASE NO. 10-55163
JUDGE MARILYN SHEA-STONUM
CHAPTER 11

**EMERGENCY MOTION FOR AUTHORITY TO OBTAIN POST-PETITION FINANCING, TO ENTER INTO INTERIM MASTER DISTRIBUTION AND OPERATING AGREEMENT, TO PROVIDE ADEQUATE PROTECTION AND REQUEST FOR IMMEDIATE HEARING**

Mueller Electric Company, the Debtor-in-Possession herein ("Debtor"), respectfully requests pursuant 11 U.S.C. §§361 and 364(b), and Bankruptcy Rule 4001(c) that the Court enter an order allowing it to obtain post-petition credit from Suzanne I. Emerson.

## I.    INTRODUCTION

The Debtor filed its Petition therein under Chapter 11 of the Bankruptcy Code on October 29, 2010, ("Petition Date"), together with various motions or applications seeking certain typical "first-day" orders.   The Debtor seeks turnover of its property pursuant to 11 U.S.C. 543, and seeks to possess, operate and manage its businesses as Debtor in Possession pursuant sections 1107 and 1108 of the Bankruptcy Code.  As of the date of this Order, no official committee of unsecured creditors has been appointed pursuant to section 1102 of the Bankruptcy Code..

As more fully described below, and in the Affidavit of E. Scoot Emerson in Support of First Day Motions ("Affidavit") the Debtor has been in a receivership since August 2009.  At the time the receiver was appointed, the Debtor had no source of funding to operate and was not in a position to challenge the request.  The receiver and his counsel have proven to be enormously expensive, having accrued or received as much as $1,000,000 since August, 2009.  The receivership has operated with little transparency or reporting on the status of the receivership case.  The information available to the Debtor suggests that the receiver is operating the Debtor

for the benefit primarily of himself and Fifth Third Bank, and he has little if no intention of paying unsecured claims.

Since the time the receiver was appointed, Debtor's owners have found funding and a buyer of the Debtor's assets that will enable the Debtor to propose a plan of reorganization to pay all creditors in full, and settle with the PBGC, in approximately 36 months. The availability of the transactions described below make Chapter 11 a viable option to restructure the company's debt, and the Debtor has filed this case at this time to implement that plan.

### Debtor and Debtor's Businesses

The Debtor is an Ohio Subchapter S Corporation that was founded in 1908 in Cleveland by Ralph S. Mueller. It has been a family owned business throughout its 102 year history. The current shareholders of the Debtor are Mary deC. Emerson 2010 Trust holding 49% of the stock, E. Scott Emerson 1989 Trust f.b.o. Suzanne I. Emerson holding 49% of the outstanding stock and Mark E. Dottore, holding 2% of the outstanding stock.

The Debtor is a manufacturer of electric clips, electronic test accessories and related products. The Debtor sells its products primarily to distributors and equipment manufacturers ("OEMs") throughout the world. The Debtor's major asset is its brand name and reputation in the marketplace for producing the highest quality electric clips, test leads and related products.

The Debtor has one location at 1208 Massillon Rd Bldg G Ste N-1500, Akron Ohio, where it employs 11 full time employees ("Akron Location"). The Debtor leases the Akron Location from LMA Commerce Two, an entity that is unrelated to the Debtor. At the Akron Location the Debtor handles its order fulfillment and shipping operations as well as some manufacturing of specialty products that cannot profitably be manufactured and shipped from China.

The Debtor has approximately $800,000 in accounts receivable, inventory having an estimated value of $2 million and machinery and equipment having a value of approximately $1,000,000. In addition there is substantial value in the Debtor's trademarks and good will. In 2008 the Debtor had net profit of $292,934 on sales of $6,727,036.

## Prepetition Credit Agreements

In 2003, in response to the reality that all of Debtor's competition was coming from China, Mueller set up a wholly owned Chinese subsidiary called Mueller Electric Shanghai, Ltd. ("MESH") and opened a factory in Shanghai to produce its test clips. MESH was the only authorized manufacturer of the most important part of the Debtor's product line.

After MESH was established and its factory grew, the Debtor became capital constrained. It needed capital for MESH to finance equipment, inventory and receivables, but no banks in the U.S. or China lend to American companies' Chinese subsidiaries. Another hurdle to finding credit was that U.S. banks could not count MESH's assets in their borrowing base to provide collateral for a line of credit.

In 2006 Debtor was approached by Fifth Third Bank ("Fifth Third") about entering into a new lending relationship. Fifth Third was willing to lend against the cash flow of the Debtor. This type of loan would provide the needed capital for MESH.

Thereafter, on or about June 27, 2006 the Debtor and Fifth Third entered into a series of promissory notes, amendments and security agreements (collectively "Loan Agreements") whereby the Debtor ultimately borrowed a total of approximately $4,400,000.00, including a revolving line of credit facility (the "Line") in the original amount of $2,600,000, and granted Fifth Third a blanket security interest in all of the Debtor's assets.

In early 2009 Fifth Third did not renew the Line. This was unexpected, as Debtor was current on all its obligations, and in fact had never been delinquent on a loan in its 100 year history. Fifth Third's decision was apparently based on a change in the regulatory environment, and a consequent need for Fifth third to exit credits that were not secured by sufficient hard collateral.

### The Receivership

On July 13, 2009, without warning, Fifth Third closed the Debtor's bank accounts and filed an action in the Cuyahoga County Court of Common Pleas styled *Fifth Third Bank v. Mueller Electric Company,* Case No. CV-09-698422 for cognovit judgment and to appoint a Receiver ("Receivership Case"). Because the Debtor needed a line of credit to operate, and had no source for such a loan, it was not in a position at that time to file for reorganization under the Bankruptcy Code. On July 29, 2009 the Common Pleas Court appointed James Bonvissuto as receiver ("Receiver"). Shortly thereafter the Receiver took control of Debtor's assets.

The day Fifth Third closed Debtor's bank accounts, the Debtor had instructed it to wire $250,000 to MESH to pay for three container shipments that were enroute. When the payment was not made, MESH could not pay its payroll, which was already one month in arrears. The police came to the MESH factory and it was sealed by the Chinese Government threatening the sole source for the major portion of the Debtor's product line.

It is highly unusual that a receiver would operate a company for over a year when he is appointed by a secured party to administer the assets. Typically such a receiver moves to liquidate the assets, and it originally did not appear that the Receiver intended to operate the Debtor, as he was not placing orders with MESH, the sole source of the most important part of the Debtor's product line. The reason could only be because the Receiver was at that time intent

on liquidating Debtor. The Receiver also made no immediate effort to replace Mr. Emerson as the person legally responsible for MESH, exposing Mr. Emerson to potential Chinese criminal penalties. Therefore in order to prevent criminal penalties by the Chinese government, civil litigation by creditors, and maintain the viability of MESH as a going concern and primary supplier to the Debtor, Mr. Emerson sent MESH $225,000 in personal funds in August 2009. He also took orders from Debtor's U.S. distributors, who were unable to get product from Debtor, and filled them with production from MESH.

Eventually, the Receiver decided to operate the Debtor. He sent letters to Debtor's customers clarifying his intentions and Mr. Emerson ceased taking orders from distributors. In January, 2009, the Receiver replaced Mr. Emerson as Legal Representative of MESH with Cliff Prosek, a Mueller Employee.

Mr. Emerson's actions to support MESH with personal funds and his placing customer orders with it in August through October of 2009 allowed MESH to emerge from serious sanctions by the PRC government, make back payroll, retain key staff and avoid multiple court filings by trade creditors. Mr. Emerson kept MESH afloat during the time that it took the Receiver to 1) learn that Debtor could be operated profitably by a skeleton staff; 2) understand that it would maximize the return to Fifth Third to operate the Debtor for a period of time, rather than immediately liquidate assets; 3) understand that the continued solvency and operation of MESH as the primary supplier to Debtor was critical to successfully operating the Debtor, and 4) eventually place production orders with MESH at a level sufficient to service Debtor's customers.

The reports filed by the Receiver in the Receivership Case do not disclose any income of the Debtor. Nevertheless it appears that from July 19, 2009 to the present, the secured loan

balance has been paid from approximately $4.4 million to $3.7 million (Affidavit, Exhibit A), and on the federal tax return for the fiscal year 2009, the Receiver reported net income of $264,354 on revenues of $4.8 million (Affidavit, Exhibit B). To date the Receiver has not filed any motions or other notices indicating that a sale of the Debtor or its assets is imminent.

Nevertheless the Receiver's control over the Debtor has led to following deficiencies:

1.  The Receiver does not intend to pay unsecured creditors (Affidavit, Exhibit C);

2.  The Receiver is operating with a skeleton staff, making no investment in the business, doing no marketing or product development, allowing sales to decline and threatening the future value of the Debtor;

3.  The Receiver is not operating the business in a transparent and fair manner, as required by the Local Rule 26 of the Cuyahoga County Court of Common Pleas; (Affidavit, Exhibits D-1 through 9)

4.  To the best of shareholders' knowledge, the Receiver is making only a modest effort to market the business for sale, as the Receiver has not allowed the Mueller shareholders or Cal Test, despite their requests, to see the Mueller asset marketing materials or present an offer for their purchase; (Affidavit, Exhibit E)

5.  The Receiver appears to be operating the business solely for the pecuniary interests of Fifth Third Bank;

6.  Under the Receiver's operation, penalty interest on the secured debt has accrued at a rate of approximately $400,000 per year, at the expense of the unsecured creditors;

7.  The Receiver's operation of the Debtor is expensive, paying himself and his counsel over $605,000 in fees for services rendered through June 30, 2010[1];

---

[1] The figure of $605,000 is only the amount of fees that were awarded that can be calculated from what is currently in the court file for the Receivership Case . The court file for the Receivership Case at the Common Pleas Court

8. The Receiver is ignoring Debtor's obligation to make distributions of earnings to its Subchapter S shareholders for federal, state and local income taxes in effect forcing them to subsidize the Receiver's operation of the Debtor.

### The Debtor's Unpaid Employee Wages and Salaries

In the ordinary course of its business, the Debtor issues payroll checks on a weekly basis. The Debtor pays payroll in arrears; the payroll period begins on Monday and ends on Sunday. Thus, the current payroll due Thursday, October 28 2010 is therefore for the period October 19 through October 24, 2010. The aggregate gross weekly payroll to all employees of the Debtor is approximately $5,000, but varies from week to week because some of its employees are paid on an hourly basis. An amount approximately equal to this sum is due and owing to Debtor's employees for the current pay period (the "Current Compensation"). This amount does not include any amount owed Debtor's officers who currently unpaid due to the Receivership.

The Debtor is not otherwise in arrears on its payroll and thus the Current Compensation is the total sum due and owing to Debtor's employees for services rendered within one hundred eighty (180) days of the Petition Date, which is entitled to administrative priority under § 507(a)(4) of the Bankruptcy Code.

Items of Current Compensation were due and owing on the Petition Date because, inter alia: (a) the chapter 11 petition was filed in the midst of the Debtor's regular and customary salary and hourly wage payroll periods; (b) some payroll checks issued to employees or on their behalf prior to the Petition Date may not have been presented for payment or cleared the banking

---

does not contain the Receiver's reports for April and May 2010, although the docket in that case shows they were filed. The order awarding the requested fees does not state the amount of those fees, but only references the respective report exhibit; therefore the Debtor does not know how much the receiver actually paid himself and his counsel for those months. The Receiver is incurring on average approximately $67,000 per month in fees for himself and his counsel. Using the estimated amount for the missing months, and adding the months for which the Receiver has not yet filed a report (July-Oct 2010) means that the Receiver may actually have incurred to date in excess of $1 million just for his and his counsels' fees and expenses.

system and therefore not honored and paid as of the Petition Date; and (c) employees have not yet been paid all their salaries and wages for services previously performed on behalf of the Debtor.

## Employee Benefits.

The Debtor maintains various plans and policies to provide its employees with medical and workers' compensation insurance and other similar benefits (collectively, the "Employee Benefits"). These Employee Benefits are described below.

### Health Benefits

An important element of the Employee Benefits is medical insurance, which Debtor provides through an insurance plan administered by Aetna ("Medical Benefits"). Based on historical practice, the Medical Benefits cost the Debtor approximately $5,000 per month. Employees and their families rely on the Debtor to provide continuing health care. Any failure to pay these amounts would be injurious to employee welfare, morale and expectations.

To the extent that any premiums under the Medical Benefits remain unpaid on the Petition Date, the Debtor seeks authorization to pay those amounts when due.

### Pension Plan

The Debtor has sponsored the Mueller Electric Company Employees' Pension Plan ("Pension Plan") made contributions ("Pension Contributions") and paid benefits ("Pension Benefits") from such plan. The Receiver has ceased making Mueller's required Pension Contributions.

The PBGC has taken control of the Pension Plan as Plan Administrator, and determined that the Pension Plan will be terminated as of the date of liquidation of the Debtor (Affidavit,

Exhibit F). Upon termination the obligation to pay Pension Benefits will be assumed by the PBGC.

No Pension Benefits remain unpaid on the Petition Date and there will be no interruption of their payment after the Petition Date.

### Pre-petition Employee Benefits Withheld from Employee Paychecks and Related Reductions and Payments

The Debtor deducts from its employees' paychecks (a) payroll taxes and the employees' portion of FICA and unemployment taxes; (b) employee contributions for Health Benefits; and (c) legally ordered deductions such as wage garnishments, child support and tax levies, if any, (collectively, the "Employee Deductions").  The Debtor forwards amounts equal to the Employee Deductions from its general operating account to appropriate third-party recipients.  Due to the commencement of this chapter 11 case, funds were deducted from employee paychecks but may not have been forwarded to appropriate third-party recipients.  By this Motion, the Debtor seeks authority to forward the Employee Deductions to the appropriate parties.

### Workers' Compensation Insurance

The Debtor provides workers' compensation insurance through premium based workers' compensation insurance programs.  The Debtor is required by law to maintain such insurance. The estimated premium for workers' compensation insurance is approximately $1,000 per month. To the extent that any premiums remain unpaid on the Petition Date under these policies, the Debtor seeks authority to pay those amounts.

### Reimbursable Business Expenses

Prior to the Petition Date and in the ordinary course of its business, the Debtor reimbursed employees and officers for certain expenses incurred in the scope of their employment.  Pre-petition reimbursable expenses averaged $100 per week.  The Debtor's

employees, in the current pay period prior to the Petition Date, are owed amounts for reimbursable expenses relating to, inter alia, business-related purchases made on behalf of Debtor, business meals, phone costs and other miscellaneous business expenses (collectively, the "Current Reimbursable Expenses"). All of these expenses were incurred on the Debtor's behalf and with the understanding that the employee would be reimbursed. Accordingly, to avoid harm to individual employees, the Debtor seeks to be authorized, but not required, to pay the Current Reimbursable Expenses in the ordinary course of business.

**Debtor's Existing System of Payment**

In conjunction with its employee payroll system, the Debtor uses GEMS Payroll ("GEMS") to print paychecks and handle payment of withholding taxes. GEMS issues a check drawn on the Debtor's bank account at Fifth Third Bank ("Payroll Bank Account"), and withholds from that account an amount sufficient to pay withholding taxes. Payment of these disbursements is routinely made via company check into employees' designated accounts from the Payroll Bank Account. Debtor is seeking authority to maintain the Payroll Bank Account and to permit existing checks for employee compensation to be withdrawn from that account until all payroll expenses are transferred to a debtor-in-possession account.

In order to ensure that its employees are paid in the ordinary course as and when compensation payments become due, the Debtor specifically requests that the order approving this Motion also provide that the banks providing the Payroll Bank Account be authorized to service and administer the Payroll Bank Account as described above without interruption, and, in the usual and ordinary course, to receive, process, honor and pay any and all ACH transfers, checks and drafts drawn on the Payroll Bank Account, whether presented for payment before or

after the commencement of this chapter 11 case by the holder thereof, provided sufficient funds are in the Payroll Bank Account to cover them.

The Debtor believes that if it does not pay the employee compensation, some or all of the Debtor's employees would suffer serious personal hardships, which in turn would cause them to seek other employment and/or no longer make their services available to the Debtor. Given the importance of the employees to the Debtor's operations, any significant loss of their services would severely hamper the operation and management of the Debtor's business and potentially result in the severe erosion of its value.

The Debtor is not seeking to assume any executory contracts. Also, the Debtor seeks only the authority to make the compensation and reimbursement payments described herein, and is not assuming any obligations to make such payments, nor is it assuming any administrative pre-petition or post-petition liabilities with respect thereto.

At the present time, the Debtor owes 11 employees approximately $5,000 for the Current Compensation. Any payments on claims entitled to priority under § 507 of the Bankruptcy Code will reduce the amounts of such priority claims. Given the fact that the services of the employees are critical to the Debtor's business, the Debtor believes that failure to pay the Current Compensation in full would severely hamper the Debtor's ability to function in the future.

### Reason for Bankruptcy Filing and Reorganization Plan

The Debtor now has a funding source that enables it to propose a reorganization plan. That plan will pay all creditors, both secured and unsecured in full, over a reasonable time period. The plan will also pay a settlement with the PBGC to the Pension Plan, for partial payment of the Plan's unfunded liabilities.

The Debtor's bankruptcy filing brings Debtor's operations into the open, with transparency for all creditors and equity, not just the secured creditor, enabling them to see what is happening with the Debtor's operations and financial condition.

The Debtor has negotiated a loan agreement with MECO Loan Company, an Ohio LLC owned by Scott Emerson and funded by Suzanne I. Emerson to fund operations from a line of credit of $500,000 secured by a lien on all receivables from the post-petition sale of the finished goods inventory of Debtor on the date of filing ("Filing Date Inventory"), and goods produced by the Debtor after the filing of this case the terms of which are outlined in the attached commitment letter (Affidavit, Exhibit G, the "DIP Loan"). The DIP Loan will bear interest at the rate of 10% until paid in full.

The Debtor has obtained a commitment from Cal Test Electronics, Inc. ("Cal Test") to enter into an agreement ("Interim Master Distribution and Operating Agreement", Affidavit, Exhibit H) with Cal Test for the operation of the Debtor during the reorganization period.

Cal Test is one of three leading companies in the U.S. market for electronic test accessories, the others being Pomona Electronics and Mueller Electric. Pomona and Mueller are the only two companies sold widely through distributors. Cal Test is the leading direct-to-OEM electronic accessory manufacturer. Pomona has by far the largest product line and market share.

The president and minority owner of Cal Test is William Hansen. Mr. Hansen is a seasoned owner/executive in the electronic test and measurement industry. He joined Pomona Electronics in 1981, leaving that company at the end of 1995 to found Cal Test after serving in his last four years as Pomona's director of engineering.

The majority owner of Cal Test is Victor Tolan. Mr. Tolan is also a seasoned owner/executive in the electronic test and measurement industry. He began his career with

Pomona Electronics in 1990, leaving that company at the end of 1995 after serving it for five years as its director of sales and marketing. Upon leaving Pomona, he purchased B K Precision, and, serving as its president, has built that company into a leading manufacturer of electronic test equipment. In 1995 Mr. Tolan also founded Cal Test with Mr. Hansen.

Under the Interim Master Distribution and Operating Agreement, the Debtor and then Cal Test will collect the accounts receivable as of the date of filing of this case ("Filing Date Receivables") and remit them in full to Fifth Third Bank as payment is received. The Debtor will sell off the Filing Date Inventory. Fifth Third will maintain its lien on the Filing Date Inventory until it is sold. Fifth Third and the DIP Lender will share a first priority lien on the receivables from the sale of the Filing Date Inventory until they are collected. As receivables are collected from the sale of Filing Date inventory, Debtor and then Cal Test will remit to Fifth Third Bank the book value of that which is sold. Fifth Third will also maintain its first liens on the remaining assets of the Debtor.

The Debtor will cease purchasing finished goods products for resale, but will continue to produce the product that is currently made in Akron. The purchase of new product from outside suppliers will move to, and be funded by Cal Test. When Cal Test receives its first shipment of those goods, the sales desk in Akron will close and reopen at Cal Test. Thereafter, the order entry, invoicing and order fulfillment will be done at Cal Test, with Debtor's Akron facility serving solely as a manufacturer of the U.S. made products.

Upon the approval of the reorganization plan, the Mueller assets will be purchased by a new company to be established and owned by Messrs. Hansen and Tolan ("Newco") under the terms of the Asset Purchase and Sale Agreement ("Purchase Agreement") attached as Affidavit, Exhibit I. Under the Purchase Agreement, Newco will pay Mueller amounts sufficient to allow

the Debtor to fully meet its obligations to *all* creditors in full under the plan.  Newco has also

agreed to enter into the Master Distribution Agreement attached as Affidavit, Exhibit J ("MD

Agreement") with Cal Test for operation of the Mueller business at a minimum until such time as

the plan obligations are paid in full.  The Debtor will retain a security interest in the assets until

Newco completes its payment obligations to Mueller under the Agreement.

Under the terms of the MD Agreement, Cal Test will:

- sell the combined product line to distributor customers exclusively under the Mueller brand name;
- perform all functions of product procurement, sales, marketing and order fulfillment for a cost of 20% of sales, close to breakeven for Cal Test, thereby maximizing cash flow to Newco for the purchase of the Mueller assets;

There is insignificant overlap between the Mueller and Cal Test product lines and a

powerful synergy in combining them.  The benefits of the MD Agreement to Cal Test are

enabling Cal Test to:

- sell its existing product line through the Mueller distributors, retaining the full profit from such sales;
- sell its existing product line under a much stronger brand name, retaining the full profit from such sales;
- develop and sell new electronic test accessory products through the Mueller distributors, and under the Mueller brand name, retaining the full profit from such sales.
- sell its existing and new products through a combined product line that is a much more complete solution to end user customers, driving growth of market share.

The benefits of the MD Agreement to Newco (and through the asset purchase, to the

Debtor and its creditors), are enabling Newco to:

- contract for the operation of the Mueller assets by an industry leader;
- sell the Mueller products through a combined product line that is a much more complete solution to end user customers, driving growth of market share;
- develop and sell new products other than electronic test accessories, under a brand with greater market share;
- sell the Mueller products through a master distributor at a very economical cost of 20% of sales.

The synergies of the agreements are such that Cal Test and Newco have committed approximately $1.8 million of capital, and the profits of Newco, to meet the obligations of the Debtor's plan. Cal Test's commitment of capital is approximately $1.2 million, representing the amount needed to fund the working capital (inventory and accounts receivable) of the business. Moving the working capital financing to Cal Test allows the Debtor to convert the bank's inventory and receivable collateral to cash, generating an approximately $1.3 million pay down of the secured debt in 3-6 months. Newco is committing an additional $500,000 of capital to in the form of an initial cash payment for the purchase of the Debtor's assets under the plan, bringing the total short term pay down of Fifth Third's secured debt to $1.8 million. The balance of purchase price for the assets that will repay the remaining the secured debt owed to Fifth Third, approximately $1.9 million, is projected to be paid to Fifth Third by month 28 under the plan.

The Purchase Agreement obviously cannot be finalized until the payment amounts and terms under the confirmed reorganization plan are known. Nonetheless, the only contingencies of the Purchase Agreement and MD Agreement are the agreement of the parties to reasonable payment terms under the plan given the projected cash flow of the company, and the plan approval (Affidavit, Exhibit K).

<b>Summary of Cash Needs</b>

The immediate needs of Debtor approximate One Hundred Thousand Dollars ($100,000.00) within the next two (2) weeks, exclusive of reorganization costs. A summary of the Debtor's estimated expenditures and income is attached as Affidavit, Exhibit L ("Budget").

<b>A.   <u>Miscellaneous Matters Under Rule 4002 (c)(1)(B)</u></b>

Pursuant to Federal Rule of Bankruptcy Procedure 4002(c)(1)(B) the Debtor has described above the (i) a grant of priority or a lien on property of the estate under § 364(c) or (d);

(ii) the providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim. There is no determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim, although the Debtor does believe at this time that Fifth Third has a valid, perfected first priority security interest in all of the Debtor's assets. That said there is no proposed finding that would prejudice the right of the Debtor or any other party in interest from challenging Fifth Third's security interest. There is no waiver or modification of Code provisions or applicable rules relating to the automatic stay. There is no waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364. There is no establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. There is no waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. There is no release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action. There is no indemnification of any entity, and there is no release, waiver, or limitation of any right under § 506(c); nor the granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).

### B.  Need For Immediate Relief

Pursuant to Bankruptcy Rule 4001(c)(1)(C)(2), a hearing on a motion to obtain credit may not be commenced until the earlier of or??? 14 days after service of the motion. However

the Court is empowered to conduct a preliminary hearing before the expiration of the 14-day period mandated by Rule 4001(c)(1)(C)(2) and to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

Pursuant to Bankruptcy Rule 4001(c)(1)(C)(2) the Debtor requests that the Court conduct a preliminary hearing on this motion substantially contemporaneously with the filing of this motion, and schedule a final hearing on the motion to obtain credit on or about November 8, 2010. The need for emergency and immediate relief in this case is evident from the facts set forth above.

### C. Notice

Prior to the hearing to approve the attached Agreed Order, the Debtor served by electronic mail or by facsimile a form of this Motion and the attached Stipulation and Order and notice of the preliminary hearing thereon on (i) counsel to Fifth Third and the Receiver, (ii) the United States Trustee, (iii) lienholders of record and (iv) the twenty largest unsecured creditors listed on the Schedules filed by Debtor pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In view of the circumstances and the interim, consensual nature of the relief requested, by this Order being entered, the Debtor requests that the Court find that such notice is sufficient.

## II. CONCLUSION

In accordance with 11 U.S.C. §361, 363, and 364, Debtor requests that this Court authorize and approve the attached Order authorizing the Debtor to obtain post-petition financing from the DIP Lender and Cal Test on the above terms, the Debtor further requests that the Court set a hearing on this motion at the earliest opportunity, and to provide adequate protection to secured parties as set forth herein and for such other and further relief as this Court may deem proper and just.

Respectfully Submitted,
/s/ Frederic P. Schwieg

Frederic P. Schwieg (0030418)
Attorney at Law
2705 Gibson Drive
Rocky River, Ohio 44116-3008
(440) 499-4506
(440) 398-0490 fax
fschwieg@schwieglaw.com
Attorney for Mueller Electric Company